Services, Appellate 18-2197 Good morning. My name is Todd Kim. I represent the appellant. I'd like to serve five minutes for rebuttal, please. That will be granted. Mr. Kim, I hope by now you and your adversary have both received the communication from the court with some topics we'd like to cover, and we were hoping that you would start with those. Yes, I always appreciate the announcement and how it can be helpful to the court. Very good. So I would be happy to talk about those. Okay. So you want to start with the first one? I think that's the way the court prefers. If you don't mind, yes. Thank you. Absolutely. So the first question the court presented was whether traditional notions of equitable estoppel are implicated here, and if so, whether they're relevant based on the facts of this particular case. And the answer to both questions is no. The answer to the first question is because the courts of Pennsylvania and Michigan, when they've talked about this separate doctrine of equitable estoppel as applicable in the arbitration context, have not referred to the separate cases about traditional notions of equitable estoppel. They simply don't do that. There are also courts in other jurisdictions that have recognized that these are two separate doctrines, despite the difference in nomenclature. And perhaps that's why the appellee here, Mr. Noye, has never claimed that traditional notions of equitable estoppel should apply. But going to the second part of the court's question, which I'm also happy to address, the facts here wouldn't support the application of traditional notions of equitable estoppel, even with respect to the use of the JJSI logo on the work sense document. And that's because one of the requirements for equitable estoppel, as recognized in cases like the novelty knitting case in the Pennsylvania Supreme Court, is that the plaintiff must have justifiably relied upon the supposed misrepresentation by the defendant. There's no evidence of that in the record. There's never been a claim of that. Why isn't it obvious, just a reasonable inference to make, that when an applicant is receiving a document with a representation that appears to be from the prospective employer, that moving forward with that employment with that employer will not commit them to binding arbitration. And they then agree to move forward that that is reliance. And as it turns out from their perspective, detrimental reliance. Well, again, with respect, detrimental reliance has just not been a factor considered by the Pennsylvania and Michigan courts. But moving beyond that, and the facts here, we would consider the work sense document along with the arbitration agreement. That's what the district court held. The work sense agreement itself does not bind Mr. Noy to arbitrate with JJSI. But it is read with the arbitration agreement, which is of course the heart of our case, which does through the doctrine of equitable estoppel. Let's be clear about the sources of authority that we need to rely on. Because we're trying to predict what the state Supreme Courts would do. And we don't have an opinion from the state Supreme Courts specifically in this context. Although we do have some pretty recent case law from the Pennsylvania Supreme Court in which they have emphasized the importance of detrimental reliance with traditional equitable estoppel in other cases. In that case where we don't have authoritative guidance from the state Supreme Court, we're directed not to look only at the state appellate courts, but also to other authority, including other state Supreme Courts. Right? As well as considered different. And we have other state Supreme Courts, including recently the New Jersey Supreme Court, that have injected notions of detrimental reliance in traditional equitable estoppel into estoppel in the arbitration context. Well, I agree with the construct. That absolutely accurately reflects what this court does in the EOD context. We're going to consider here what the Pennsylvania and Michigan Supreme Courts would do based on the precise circumstances here. And what equity would demand based on those precise circumstances. And what this court has done in previous cases involving equitable estoppel is look to the intermediate appellate courts. We see that, for instance, in White v. Sinoco, where this court looked to the decisions of the Florida intermediate appellate courts because they knew the Florida Supreme Court had not even decided whether to adopt this doctrine. So applying that analysis equally here, we look to what the Pennsylvania and Michigan intermediate appellate courts have actually said. And what they've said is, we apply equitable estoppel in the arbitration context when there's an obvious and close nexus between the signatories or the contract and the non-signatory. And that's precisely what we have here. But I'm jumping ahead because there are other questions that the court asked in its Tuesday letter, and I want to make sure I get to all of those. So the second... Let's look at the same question, not from the context of equitable estoppel per se, but just contract language. Because here that overlaps with the way that the appellate courts in Elwyn and Dodds analyzed the contract. And that is, if the contract by its terms appears limited to the parties and limits the arbitration clause to those parties, that was taken to be significant in Elwyn, distinguishing the language in Dodds. And here when we look at the WorkSense documents compared to the arbitration clause, don't we have exactly that contrast? Where the arbitration clause speaks to disputes between the applicant and Kelly. And the language of the WorkSense documents, again, whether you think about it in terms of what Johnson and Johnson is representing in equitable estoppel, or just the terms of the contract itself, talks about disputes between the customer, J&J, and its employees. That is, in this case the applicant, who are not going to be bound to arbitration. Why shouldn't we, even drawing on the guidance from Elwyn and the way it contrasts Dodds, anticipate that the Pennsylvania Supreme Court would assign significance to that difference in language and conclude that Johnson and Johnson was precluded from enforcing arbitration because the arbitration clause is limited to the applicant and Kelly. Your Honor, I appreciate the analysis, and there's a lot in your question, so I hope I get the chance to respond to all of it. The first thing I would emphasize is the precise language of this clause. So the arbitration agreement here says, and this is at Joint Appendix 83, this is in paragraph 2, which says claims subject to agreement. This language distinguishes our case from Elwyn and makes it more like Dodds, which we think is the relevant Pennsylvania precedent. The language that I quote, the covered claims under this agreement shall include all common law and statutory claims relating to my employment. That's not limited by parties, unlike the arbitration clause in Elwyn. Going on, this language was bolded and agreed to by Mr. Noye, who signed this agreement. I understand and agree that arbitration is the only forum for resolving covered claims. But as I understand it at JA 83, covered claims include those that arise between the applicant and Kelly services, and I think that was judged across this point. No, that's just not what the language says, Your Honor. The agreement of paragraph 1, which is the agreement to arbitrate, says that the agreement is to use binding arbitration for covered claims, which granted has the very broad definition you just read, but for covered claims that arise between me and Kelly services and related and delineated parties, which you've represented, Your Honor. I understand that. I was going to get to that, Your Honor. So what I just said was what the agreement said. You just said to me that's not what the agreement said. Now, there's a very important understanding of the facts. Which did we articulate the language that appears in the document in JA 83? JA 83 in paragraph 1 does say I agree to arbitrate with Kelly. Paragraph 2 says the claims that require arbitration are all employment-related claims. Those two are completely logically consistent. What it means is the party's intent was that all claims related to employment shall be subject to arbitrate, and they also say, and by the way, I expressly agree that I'm going to agree to arbitrate with Kelly. Okay. So there's two issues here. There's a who issue. There's a what issue. Yes, Your Honor. Let's say you've convinced me that the what is covered. To reframe my colleague's question, JA 83's who is only about Kelly and says you have to arbitrate with Kelly, but JA 92's who is when it comes to the other party, J&J, you have to use non-binding, but you're not agreeing to binding. Why shouldn't we put these two together by saying, okay, arbitrate with Kelly, but don't arbitrate with J&J because that's how you could harmonize the two? Because that's just not the agreement's say. So the work sense agreement says this agreement does not require you to arbitrate with JJSI. The arbitration agreement with this who and what language we discussed says all statutory or common law employment-related claims shall be resolved through arbitration. That's what it says. So this follows from... No, I'm sorry. Paragraph 1 says agreement to arbitrate. Kelly Services and I agree to use binding arbitration instead of going to court for any covered claims that arise between me and Kelly Services. I completely agree with that, and I think paragraphs 1 and 2 are consistent and complementary, but paragraph 2 is broader. Paragraph 1 expressly memorializes that Kelly and Noy agree to arbitrate. Paragraph 2 goes broader, and this is what makes our case like Dodd's and not like Elwin. Elwin limited the category of claim expressly to claims arising between the parties. This agreement is the opposite. It says, yes, Kelly and Noy will arbitrate, but it goes further and says all statutory or common law employment-related claims shall be resolved only through arbitration. Mr. Noy agreed to that. It was even bolded. So this case is like Dodd's. It's not like Elwin. Dodd said arbitration shall be required when both claims stem from the same facts and indicate identical legal principles. That's what we have here. That's why every case from other courts that have considered similar facts has required the application of equitable estoppel. Only that result promotes the purposes underlying the doctrine. I'm into my rebuttal time, if I may. We're going to ask you to answer the questions that the court wanted. Yes, I would be very happy. I was going to talk about the purposes underlying the doctrine. Determining and running of arbitration agreements. Maintaining the consistency of verdicts. Preserving party and judicial efficiency by preventing duplicative litigation. This, by the way, is language that Pennsylvania Supreme Court has given me. I'm not making this up. Well, let's talk about the choice of law, though. Did you waive any arguments about choice of law when you said that we should be, that you agreed with Noy that the DuPont standard applies? That's one question. Then a related question is, is the DuPont standard an accurate statement of Pennsylvania law? So, with regard to the first question first. No, we did not. Consistently, in every single document the court cited in this letter, my client indicated that Pennsylvania and Michigan law were both relevant. Yes, it did indicate that the DuPont standard was the relevant standard. For purposes of Pennsylvania law, but every one of these documents, I can cite particular page numbers if you want, continue to refer to Michigan law as well. And that's underlying our entire position below. Our entire position below is that there is this obvious and close nexus between the non-signatory and the signatories. That's enough. There's also this substantially concerted interdependent misconduct, that's the Michigan standard, that we continue to cite to in the papers below. So, no, there was no waiver. There was no waiver. Given that you advocated to the district court that it adopt a conjunctive test and that that was the proper formulation, and you persuaded the district court to accept that position, how can you now come before us to say that the district court erred in adopting the position you espoused? Why isn't that just the quintessential waiver? I'm happy to talk about that separate waiver question, because there's the Pennsylvania versus Michigan question. There's also the what is Pennsylvania law question. As to the second question, Apley has never presented a waiver argument to this court. Comes close, but never actually does it. It's required to articulate a waiver argument if it doesn't want to waive the waiver argument. That's the Freeman case and other cases. But more to the point, one reason why it's possible the Apley didn't raise that argument is because it's well-recognized. Now, where the district court passes upon a legal issue, this court must be able to consider the correctness of what the district court said. The district court said this is Pennsylvania law. Pennsylvania law requires a conjunctive test. We actually don't think that accurately reflects Pennsylvania law. But I'd also hasten to note it doesn't matter in this case. This court doesn't need to resolve whether Pennsylvania actually has a conjunctive test and or test, because we satisfy all the different standards the parties have articulated. And that's because our claim, the claim that Mr. Noy brings against us, is the same claim he brings against Kelly. Same fact, same operative theory. His theory is that we stand in Kelly's shoes for purposes of this claim. That's why equity requires that both defendants be allowed to invoke arbitration. And it's especially inequitable here, where Kelly has been arbitrating with Mr. Noy. If he's right, would be able to bring Kelly back into court through the back door in discovery with JJSI. These are the reasons why, in similar cases, courts have applied equitable estoppel and said, no, this entire dispute should be arbitrated. Let's go to the final subject that was in the inquiry from the court. It had to do with whether JJ waived its argument about whether a close relationship existed based upon its own responses to discovery, in which it, for lack of a better word, gave great distance to its relationship between Kelly and itself, describing itself as a customer of ND. Thank you, Your Honor. With respect, I don't think the discovery responses indicate great distance. There was a response in discovery saying that we are a customer. That is an accurate response to a question about one way to describe the relationship between JJ and Kelly. Then what evidence, if that's your position, while our label is customer and we still have a close relationship, what evidence in the record would support the nexus conclusion that you've indicated Pennsylvania law requires? Yeah, I would point first and foremost to the complaint itself. The complaint itself, this is what Mr. Inouye wrote. The complaint itself describes in detail the hand-in-glove relationship he sees between JJSI and Kelly for purposes of this claim. Look at paragraph 38. 38, for instance, says that JJSI and Kelly together implemented and created a national uniform hiring practice. Together. Paragraph 49. Paragraph 49 says JJSI and Kelly together hired Yale for the purpose of providing pre-adverse action notices. Look at the paragraphs upon which he relies. Paragraphs 28 to 37. It is one seamless course of conduct involving JJSI and Kelly. Indeed, paragraphs 36 and 37, where he says they were a violation, are verbatim. The same thing. But you want to surmise his allegations. Would you be saying the same thing if you were trying to distance yourself? Wouldn't you tell us we need to look at the evidentiary record and not the allegations in the complaint? Well, discovery, if anything, only confirmed the things that are in the complaint. Tell us about what's in discovery, then, that would support the close nexus relationship. With respect, this all goes to arguments that Mr. Inouye never made, but I'm happy to address it. So, for instance, the Joint Appendix has a deposition testament from Mr. Corbett, who was JJSI's 36th deponent, who talked about the relationship between JJSI and Kelly. But I don't think you need to go beyond the complaint, because for purposes of whether Mr. Inouye should be adequately stopped, let's rely on his own complaint. That's what he wrote. And that's why, for instance, courts in Pennsylvania and Michigan have looked at the complaint and said, wow, this itself paints the picture that the plaintiff's theory is that the two defendants are really the same. That's what this complaint, in effect, does. I'm willing to go further. Before we turn the table over to... Okay, we'll have you back up on rebuttal. Thank you very much. Ms. Gilbride. Good morning. May it please the Court, Carla Gilbride, representing Mr. Inouye. The only document related to employment that Mr. Inouye signed that had Johnson & Johnson's name and logo on it stipulated that he did not commit to binding arbitration with J&J. Yet J&J now seeks to bind Mr. Inouye to binding arbitration based on a separate arbitration agreement that explicitly limits its scope not once but twice to disputes between the employee and Kelly Services. Did your advocacy before either the District Court or in your briefs to us make the argument that there was this reliance on the J&J WorkSense paragraph that I believe you're referring to? Yes. Before the District Court, we made several arguments related to the WorkSense agreement. Specifically, we had argued that the WorkSense agreement superseded and was inconsistent with the Kelly arbitration agreement. The District Court did not find that to be the case. However, we continued to argue before this Court that it would be inequitable for Mr. Johnson, I mean for Mr. Inouye, who understood himself, understood Johnson & Johnson to be the employer when he signed that document and understood himself to be agreeing to non-binding ADR proceedings but not to binding arbitration with J&J based on the terms of that agreement. He confirmed that both in a declaration, which is in the record, and in his deposition testimony which is in the joint appendix. And we made that point before this Court as well. J&J continues to rely on the Second Circuit's opinion in Ragon and the case involving ESPN because ESPN was understood to be the employer or perhaps the joint employer of the plaintiff in this case. In our brief, we talked about the Lucy case that interpreted the Ragon Second Circuit opinion and again talked about what the plaintiff's understanding was, very similar to the concept of detrimental reliance. And here, Mr. Inouye's understanding of his relationship to these two parties was that Kelly was the staffing agency through whom he conducted the interview and did some of the initial paperwork, but that he was going to be employed at Johnson & Johnson. And when he signed this document that had Johnson & Johnson's logo and name on it that talked about the specific concept of binding arbitration, what it said about binding arbitration is you're not agreeing to it. Let me ask you this. What do you understand the law of Pennsylvania to be for what they've called alternative equitable estoppel, the type of estoppel that your client has upon your client? What is the test? The test is the same test this court recognized in White v. Sinoco for Pennsylvania law and articulated at footnote 5 of that opinion, very similar to the EI DuPont test that Johnson & Johnson advocated before the district court, which is that there be both a close nexus between the contract or the contracting parties and actual language of the second test and it's inextricable, yes, that the claims be inextricably entwined with the contract. And here we have neither of those things. Well, you also don't have reliance either. Neither of those tests speak of reliance and you're asking us from your initial remarks to rule on a reliance ground. Well, our position is that either under the traditional notions that involve reliance or inconsistent positions, I think that there's perhaps less of a distinction between the traditional notions of equitable estoppel as this court defined it in your letter and this test from DuPont and Elwin that was mentioned in footnote 5 of white. I think there's less of a difference because what it really comes down to is trying to have it both ways. And that's why this inextricable entwining with the contract point keeps coming up. If a plaintiff that's a signatory to an agreement is relying on the agreement in any way, both to assert their claims for breach of that agreement, that would be the most traditional and straightforward connection. And that's what you had in the Sarles case, a federal district court opinion applying Pennsylvania law. But you can rely on the terms of the agreement in other ways. In the Booth case, which appellant cites, the allegation there was that the underlying contract was ujurious, the payday loan agreement, and it was illegal. But that was still relying in detail on the terms of the agreement. Here there's absolutely no connection between the claims for violations of the Fair Credit Reporting Act in Mr. Noye's complaint and any terms of the arbitration agreement that Johnson & Johnson is seeking to enforce. I mean, the terms of that agreement could be completely different or that agreement could be declared void and disappear from the record and it would make no difference to any of his claims. The entwining question as simply a manifestation of whether there's a close nexus between the non-signatory and the contract. That is, looking at, in particular, Elwyn, but also in relation to Dodds, it seems that the Pennsylvania appellate courts are looking at, on the one hand, you can have a nexus between the non-signatory and the contracting parties, but an alternative, disjunctive in the way they formulate the test, is that it's with the contract. And when it comes to the nexus of the non-signatories and the contract, it looks like the Pennsylvania courts are taking two alternative approaches to that. One question is, do the terms of the arbitration clause preclude bringing in a non-signatory? But when the answer to that is, yes, by their terms they do, and if that were the end of the inquiry, there wouldn't have been a reason in Elwyn to go on and look separately at the next question they did of is there entwining with the nature of the claims themselves? And that's where we get pulled into the question of following Rangoon and the Second Circuit's approach, where the complaint itself seems to intertwine conduct so that the claims are intertwined, even if we're outside the scope of the contract in terms of the covered parties. Is that the right way to think about as best we can deduce Pennsylvania law given these cases? Yes, Judge Cross. I think that our reading of Elwyn is that it actually, and apparently the panel in white, the Sinoco, when it quoted Elwyn in footnote 5 as stating Pennsylvania law, that is why it's a conjunctive test, why the close nexus between the non-signatory and the contract or the contracting parties and the intertwining are both required. And I think that the difference between Elwyn and Dodds is significant here for two reasons. The first reason is if you look at the terms of the agreements, and this goes to Judge Bevis' question about the who and the what, and whether or not the terms of the Kelly agreement limit the scope to only claims between Kelly and the employee. Our position is that they do, and that's an independent basis following from how Elwyn interpreted the language in that agreement for finding that Johnson & Johnson cannot enforce this agreement. It's completely separate. Would that be an arbitrability question? The point you just made that the contracting terms in the arbitration agreement eliminate the dispute between the who's as Judge Bevis was speaking about, a question of arbitrability? Well, it goes to the scope of the agreement, and so again, to just disaggregate the who and the what, Kelly services are mentioned twice at page J83. First, it says Kelly and I agree to use binding arbitration. That's the who, right? So yes, can non-signatories, if the doctrine of equitable estoppel is met, come in if they're not listed in that who? Yes, they can. Not here. We don't believe equitable estoppel is met here. But that's what we've just been discussing. But if you follow through the rest of the language of paragraph one of the agreement, Kelly and I agree to arbitrate instead of going to court for any covered claim, that's a defined term, defined in paragraph two. That's what opposing counsel spent some time reading. Any covered claims that arise between me and Kelly services. There is the limitation again. Or it's related or affiliated companies. Yes, and in JA page 167 in the deposition of Corbett, which was a 30B6 designee of Johnson & Johnson, he was asked, do you have the affiliated company of Kelly? And he said no. He's speaking for J&J there, and he said they don't fit that definition. And then just to turn to another point about how closely are the claims related. Johnson & Johnson continues to refer to the complaints as we're alleging the exact same claim in paragraphs 36 and 37 against the two defendants. And so one is acting through the other or J&J is standing in the shoes of Kelly. That is not how these claims were pled. They're pled as two separate and independent violations of the FCRA. One by Kelly who did not provide the report as required by 15 USC 1618 BB3. And then separately, Johnson & Johnson did not provide the report before taking adverse action. We've been talking for a while about Pennsylvania law, but the only state whose law is expressly mentioned in these documents is Michigan law. We have a choice of law provision. Now, J&J isn't a party to JA 83, but if we want to think about if Pennsylvania law itself is governing making the choice of law, and Pennsylvania law puts a lot of weight on the choice of law clauses, this might be within what the party's envisioned, expected. Your client thought he was contracting with J&J and if we want to ensure uniformity and not dividing disputes, why shouldn't we be applying Michigan law here? And if we do, why wouldn't Michigan law favor arbitration? Two answers to that, Judge Bevis. For one, it is not necessary to apply Michigan law. The district court applied the Pennsylvania choice of law rules, which and this was also consistent with the position that J&J took before the district court saying you don't need to apply both, you can apply either because they would come out the same way. And so taking them at their word and following Pennsylvania choice of law rules, which say if there's not distinction between how the laws would analyze the issue, we'll just apply one. And so the district court focused on and to your question, the result would not be different under Michigan law. The Michigan Intermediate Appellate Courts that have dealt with this issue have looked to the terms of the contract and the relationship between the claims and the contract just as Elwin and Dodds have under Pennsylvania law. The City of Detroit Police and Fire Retirement System case from 2010 that Johnson & Johnson cites basically ends the same way that Dodds ends, which is saying this is essentially a contract claim. They're trying to enforce the terms or rely on the terms of this agreement regarding investment advice that they received, but they don't want to arbitrate with some of the parties that were related. And that's the same thing that the court in Dodds said. This claim is essentially a contract claim. They're just trying to plead around the arbitration agreement by adding in another party who's not a signatory and by adding in a fraud claim, but it essentially sounds in contract. That is not the case here. This is a freestanding statutory violation that both defendants are equally liable for. Johnson & Johnson mentioned paragraph 39 of the complaint. In paragraph 39 of the complaint at Joint Appendix 47 we state that separate businesses each can either take adverse action and before taking adverse action are independently responsible for providing the notification under the FCRA. And there was adverse action taken here by Johnson & Johnson. They made the decision not to hire which was communicated to Mr. Noya through Kelly. You seek liability against both, but the way the complaint is pleaded, it references J&J relying upon Kelly's use of the disclosure form to obtain background reports on applicants for employment with J&J. And in talking about J&J and Kelly using criminal background reports generated by nationwide consumer reporting agencies, talks about doing that as part of its hiring process. J&J and Kelly use criminal background reports. In other words, throughout the complaint seems to be discussing the activities of these two entities as if they were a single entity or certainly acting in concert because J&J relies upon essentially outsources for these 10 staffers. It's hiring to Kelly. Doesn't that make these intertwined in the same way that the entities were entwined in Rangone, whether we're looking at that test as part of Pennsylvania law or Michigan law? They are not intertwined either with each other.  Kelly is saying it's simply a vendor-vendee relationship. It is not a related or affiliated company. And as both Pennsylvania and Michigan law require, the actions here and the claims here are not intertwined with the contract. They're a separate freestanding statutory violation that has no nexus to the terms or obligations of the agreement. And again, paragraph 39 states that any person intending to take adverse action, that can be multiple entities with respect to the same relationship here, the employment relationship or potential employment relationship, have an independent obligation to follow the FCRA. Neither of them did here. And there are actually separate class allegations pled against J&J for when they failed to comply with the FCRA and against Kelly when they failed to do so. And Mr. Noyes should be able to pursue his actions against J&J for that violation in court because the agreement he signed with J&J said he would have the right to do that. Mr. Kim made the argument a few minutes ago and in briefing that as a practical matter, J&J would be brought, or Kelly would be brought into any litigation that was proceeding against J&J because of the nature of their relationship and where documents lie. Note that the Seventh Circuit has said that once a court knows a dispute is going to be arbitrated, that the reasons for requiring claims against affiliated parties to be arbitrated become more powerful. Do you agree that that is a valid consideration in the test that would be applied by the Pennsylvania and Michigan courts? I would say that the U.S. Supreme Court has held that sometimes piecemeal litigation is required by the terms of the contract that parties have agreed to. It said that in the Moses H. Cone case. And here I would say that the terms that the parties agreed to specified that there would not be binding arbitration between an employee of J&J placed there through Kelly's staffing efforts and J&J, whereas there can be or must be binding arbitration between that employee and Kelly. That was the choice that Kelly made through the terms it used. I'm not sure that's right because when I read JA92, the work sense agreement, the eligible disputes discussed in there are those between you and the customer, between you and us, between you and the customer both the customer and us. So that would suggest that there's possibly some tension between the two documents. And if we're going to find some tension, the document JA83 at the top that is titled Dispute Resolution Mutual Agreement to Binding Arbitration and has the bold-faced sentence would seem to be more explicit about it. I mean, I'm not sure how you could say it's neatly JA83 is about disputes against Kelly and JA92 is about disputes against J&J. Well, I would again just turn, Your Honor, to the language that JA83 limits the term in paragraph one. It says covered disputes that arise between me and Kelly and its affiliated and related companies, which J&J has said it does not belong to that category. And then I would turn your attention to the top of page JA90, which has Johnson & Johnson's logo and says this is an employment agreement for staff, for folks placed with Johnson & Johnson. And that was Mr. Noye's understanding of the scope of that agreement is that he was hoping to be placed with Johnson & Johnson. He would be employed there. And he was agreeing to engage in non-binding ADR processes, but not in binding arbitration. But doesn't that same language, though, that you're referring to where there was an agreement to engage in non-binding ADR methods offered by, in this case, J&J, assuming they were offered? It's simply saying if the customer here, J&J, happened to offer ADR, it would be non-binding. Why is that inconsistent with the fact that a binding ADR process could still apply? How are they inconsistent? Well, a binding ADR process does apply and it applies as to covered claims that arise between me, Kelley Services, and affiliated and related companies. But that does not include J&J. I see. I understand your argument then. Okay. Well, thank you very much. Thank you, Your Honor. Thank you. I have three points I'd like to cover, if that's okay with the Court. Of course. I appreciate the time on rebuttal. The first goes to the nature of the Work Sense Agreement as related to the Arbitration Agreement and also just to justifiable reliance and whether or not there's any basis for traditional notions of equitable estoppel to apply. The second goes to the nature of Mr. Noy's claim. This goes to whether this is the same claim between JJSI and Kelley. And the third goes to the Elwin case and the nature of the equitable estoppel doctrine itself. So taking these points in turn. First, the Work Sense Doctrine and the Arbitration Agreement should be read together and going with Judge Bevis' question, I should note that really they cover different things. The Work Sense Agreement is about dispute resolution processes with the customer in its capacity as customer. But Mr. Noy's theory goes to the Arbitration Agreement because that's about claims related to in the capacity as employer. Now, JJSI is not Mr. Noy's employer. That's made quite clear. But his theory is that JJSI takes the employer hat for purposes of his claim. That's what's covered in the Arbitration Agreement not the Work Sense Agreement. Now, if we're going to talk about justifiable reliance I would note Mr. Noy presented multiple declarations in the record. We've talked about whether or not there's summary judgment style evidence as well as just allegations of complaint. Not one of those says that he relied upon the Work Sense Agreement in the sense we've been talking about today. I'm not sure I understand your first argument because in your brief you position is that whatever confusion there may have been on Mr. Noy's part, J&J is the customer for purposes of this employment agreement. So this is on its face appears to be an employment agreement for contract labor employees on assignment at Johnson & Johnson under Johnson & Johnson letterhead. And it's discussing disputes between the customer, which is Johnson & Johnson, and their employees. Right, Your Honor. So, but we read the two agreements together and going with Judge Bevis' question, yes, indeed, if one of these is relevant to the dispute at hand in which Mr. Noy's theory is that JJSI functioned as an employer. Again, we dispute that, but we're accepting that for purposes of deciding whether this is arbitral. That's his theory the Arbitration Agreement is one that's relevant because the Arbitration Agreement says I understand and agree that all covered claims shall be resolvable only through arbitration. And the definition of covered claims says that all claims related to his employment are included. So that's point number one. Point number two goes to this question, what is the nature of Mr. Noy's claim? And is it really the same claim as to JJSI and to Kelly? Isn't the key difference that, I mean, Dodds, we essentially had covered, we just had covered claims. There was a definition of what was covered that could stand on its own and where you could impute the intention to arbitrate any of those claims with any other party. But LWIN seems like it's on all fours with this. That is, it had talked about disputes, which would be where covered claims comes into play, but it's the disputes between the owner and the contractor. And here we've got the reference to disputes between J&J and our customers and their employees. Why isn't this on its face on all fours with LWIN? Again, there's a lot of naivety. I get to it all. I know I have limited time. So LWIN was not like this case in the sense that there are two separate documents we're talking about. So LWIN didn't have an analog to the WorkSense agreement. So as the district court did, we would read the arbitration agreement and the WorkSense agreement together. One was signed the day after the other one. They all should be considered together. Mr. Kim, was there ever an assignment of NOI to J&J? No, I don't think so. At least not as pled by Mr. NOI. In LWIN, there was a specific limitation in the definition of claim. That's what the LWIN court emphasized. The definition of claim limited the claims to those between the parties. That's exactly the opposite of what this arbitration agreement does. This agreement says by subject matter, the covered claims includes everything related to my employment. So the fact that in a separate clause, the arbitration agreement says, and I agree to arbitrate with Kelly, doesn't say I will only arbitrate with Kelly. Paragraph 2, the key one here, makes this case like God's, not like LWIN. Even when we consider the WorkSense agreement, which is a separate agreement, which just also says in this agreement, you don't bind yourself to arbitration with a customer. Even assuming that that is the appropriate agreement to be looking to at all. The second point I wanted to get was much of the nature of the particular claim here. Not only is it the allegation of the claim, it's more than that. The nature of his claim, and we heard it at podium today, is that if either JJSI or Kelly had provided the requisite information to Mr. NOI before the singular adverse action, neither one would be liable. And if that's the case, that is joint misconduct at best. It's indivisible. And that is different from the other cases. And the third point I wanted to make, just going back to the LWIN case, and to the nature of equitable estoppel itself in Pennsylvania, Michigan. Read the way Mr. NOI would read it, LWIN would say that equitable estoppel in this context applies only when mandated by the contract terms. That's what I hear him saying. That's impossible because the very nature of the doctrine, the reason for its existence as a freestanding doctrine, is because equity sometimes requires going beyond the technical terms of the contract. I think your adversary might have even conceded that. Just because the language says it's between Kelly and NOI, that if the doctrine of equitable estoppel could pierce that. Right. I believe that was what I heard her say. If so, that's great, because that's true. I don't see daylight between the notion that LWIN requires that the claim be made arbitrable in the contract by its terms and the true nature of equitable estoppel is recognized by Pennsylvania and Michigan, and is conceded by everybody here in the district court. If this exists as a freestanding doctrine, it has to apply in circumstances like this one where the essential nature of the claim against both defendants is the same and concededly there is an arbitration at least to one of them. Mr. Kim, you had represented before the district court that J&J was not an affiliated or related party, affiliated or related entity in terms of its relationship with Kelly. Just to be clear, that's still J&J's position. We have not argued otherwise on appeal. We're not claiming a third-party beneficiary theory. We think the proper doctrine to apply here is the equitable estoppel doctrine. Thank you very much. We thank both sides for a well-argued case.